IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

FOUNDATION FOR LOST BOYS :
AND GIRLS OF SUDAN, INC., et al., :
           :
  Plaintiffs,     :
           :
v.          : CIVIL ACTION NO.
           : 1:15-CV-00509-LMM
           :
ALCON ENTERTAINMENT, LLC, et :
al.,         :
           :
           :
  Defendants.    :

## **ORDER**

   Pending before the Court is the Motion to Dismiss by Defendants Alcon

Entertainment, LLC, Imagine Entertainment, LLC, Good Lie Productions LLC,

Black Label Media, LLC, Reliance Big Entertainment (US), Inc., and Margaret

Nagle [9]. Defendants Deborah Jelin Newmyer and Outlaw Productions filed a

Notice of Joinder in the Motion [16]. Plaintiffs, fifty-four Sudanese refugees and a

foundation they created in part for the purposes of this lawsuit, have responded

to the Motion, which is fully briefed and ripe for review. After a review of the

record and due consideration, the Court enters the following Order:

## I.    LEGAL STANDARD

Defendants[1] move under Federal Rule of Civil Procedure 12(b)(1) to dismiss Plaintiffs' declaratory judgment claim pursuant to the Copyright Act for lack of subject matter jurisdiction. FED. R. CIV. P. 12(b)(1); Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232 (11th Cir. 2008). A motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) may be based on a facial or factual challenge to the complaint. McElmurray v. Consol. Gov't of Augusta-Richmond Cty., 501 F.3d 1244, 1251 (11th Cir. 2007) (citing Williamson v. Tucker, 645 F.2d 404, 412 (5th Cir. 1981)). Defendants make a facial attack here, which "requires the court merely to look and see if the plaintiff has sufficiently alleged a basis of subject matter jurisdiction," and for purposes of the motion, Plaintiff's allegations in the complaint are taken as true. McElmurray, 501 F.3d at 1251 (quoting Lawrence v. Dunbar, 919 F.2d 1525, 1529 (11th Cir. 1990)) (alterations omitted).

Defendants move to dismiss Plaintiffs' remaining claims under Federal Rule of Civil Procedure 12(b)(6), which authorizes dismissal where the facts as pleaded do not state a claim for relief that is plausible on its face. FED. R. CIV. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss."); Bell Atl. Corp. v.

---

[1] Defendant Jeffrey Silver has not appeared in this action. Plaintiffs have twice requested and received extensions of time to perfect service of process, see Dkt. Nos. [20], [25], but have not filed proof of service on Silver. Hereafter, the Court shall refer to all moving defendants as "Defendants," notwithstanding the lack of apparent service on and appearance by Mr. Silver.

Twombly, 550 U.S. 544, 561–62, 570 (2007) (retiring the "no set of facts" pleading standard established in Conley v. Gibson, 355 U.S. 41, 45–46 (1957)).

In Iqbal, the Supreme Court reiterated that although Rule 8 of the Federal Rules of Civil Procedure does not require detailed factual allegations, it does demand "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678. In Twombly, the Supreme Court emphasized that a complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." 550 U.S. at 555. Factual allegations in a complaint need not be detailed, but "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Id. (internal citations and emphasis omitted). A complaint is plausible on its face when it provides the factual content necessary for "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

## II. FACTUAL BACKGROUND[2]

The fifty-four individual Plaintiffs (the "Lost Boys") are Southern Sudanese refugees and residents of the state of Georgia fleeing genocidal activity occurring

---

[2] Unless otherwise indicated, the following facts are made solely for the purposes of this Order and are construed in Plaintiffs' favor consistent with the Court's task on a Motion to Dismiss. To the extent Defendants have challenged Plaintiffs' allegations with record evidence, the Court will address those challenges within the relevant section of this Order.

during the Second Sudanese Civil War. Complaint, Dkt. No. [1] ¶¶ 1, 3, 21-31. As repeated militia raids on Southern Sudanese villages made militia tactics more predictable, the Lost Boys and others were instructed to flee their villages at the first signs of attack. Id. ¶ 25. The Lost Boys and others walked for months through the wilderness before reaching refugee camps in Ethiopia and Kenya, experiencing many trials and tribulations, often unique to each Lost Boy. Id. ¶¶ 28-29. The Lost Boys and thousands of others were granted asylum and residency in the United States, and the Lost Boys settled in and around Atlanta, Georgia. Id. ¶¶ 32-34. As part of their effort to deliver aid to South Sudan, the Lost Boys created Plaintiff Foundation for Lost Boys and Girls of Sudan, Inc. (the "Foundation"). Id. ¶ 34.

In 2002, Plaintiffs Awino, Magok, Nyok, and three others met Robert "Bobby" Newmyer, a film producer and partner at Defendant Outlaw Productions. Id. ¶ 36. When Awino, Magok, and Nyok told Newmyer about some of their experiences prior to arriving in the United States, Newmyer expressed interest in making their stories into a feature film and agreed to travel to Atlanta to meet with them. Id. ¶ 37. Newmyer and Outlaw recruited Defendant Nagle, a screenwriter, to write the script of a screenplay incorporating "real, personal and emotional details" of the Lost Boys' stories "otherwise unavailable to the public at large." Id. ¶¶ 38-39.

In 2003, Nagle and Newmyer traveled to Atlanta to interview a number of Lost Boys to provide Nagle with background, stories, facts, and other material to

write the script. Id. ¶¶ 39-40. Before beginning interviews concerning their individual experiences in escaping war and making their way to the United States (the "Interviews"), the Lost Boys demanded to know what compensation they would receive for their assistance. Id. ¶ 42. After conferring, Newmyer and Nagle explained that, until details of any film production using the not-yet-written script were determined, agreeing on compensation from that production was impossible. Id. ¶ 46. Nonetheless, in exchange for participating in the Interviews, Newmyer and Nagle orally offered to pay the Lost Boys $55,000 "immediately"; to withhold permission for any studio or filmmaker to use the script for a film without the Lost Boys' consent; that the Lost Boys' consent would only be given after reaching a agreement as to their compensation with the studio or filmmaker; and to ensure that any film production would include a fundraising effort, the proceeds of which would be directed solely to a new nonprofit foundation to be organized and run by the Lost Boys. Id. ¶¶ 43-48, 52-56.

Nagle and Outlaw, through Newmyer, thus partnered with the Lost Boys on the terms of this offer to (1) create the screenplay, formed through the Lost Boys' contributions of their experiences in the Interviews and Nagle's contribution of synthesizing those experiences into a coherent script (the "Screenplay"); and (2) seek to sell the Screenplay to a studio or filmmaker to produce a film from the Screenplay. Id. ¶¶ 50-51. Together, Plaintiffs call the terms of Newmyer, Nagle, and Outlaw's offer, the Lost Boys' subsequent agreement to contribute to the screenplay, and the parties' planned efforts to

produce a film based on the screenplay subject to the agreed-upon terms, the Joint Venture Agreement ("JVA"). Id. ¶ 50.

The Lost Boys accepted this offer and proceeded with the Interviews. Id. ¶ 49. The Interviews were recorded, and either Newmyer or Nagle (or both) retained all recordings. Id. ¶¶ 49, 57. Nagle used material gained from the Interviews and from subsequent discussions with certain of the Lost Boys to write the Screenplay, later titled *The Good Lie*. Id. ¶¶ 59-61. The Lost Boys, Newmyer, and Nagle met several times to discuss the Screenplay and efforts to turn it into a film subject to the JVA. Id. ¶¶ 62-64. Nagle and Newmyer remained committed to the terms of the JVA. Id. ¶ 64. On December 12, 2005, Newmyer unexpectedly passed away. Id. ¶ 65.

Over the next several years, the rights in the Screenplay were sold multiple times. First, without the Lost Boys' knowledge or consent, Nagle and Outlaw sold production rights in the Screenplay to Paramount Pictures Corporation. Id. ¶ 69. Awino informed Paramount of the JVA upon learning of the sale, and thus that Paramount's production rights were contingent on the Lost Boys' consent and adequate compensation. Id. Some time after the sale to Paramount, Defendants Reliance Big Entertainment (US), Inc. and Imagine Entertainment, LLC purchased production rights in the Screenplay from Paramount. Id. ¶ 70. In conjunction with Reliance and Imagine, Defendants Alcon Entertainment, LLC, Black Label Media LLC, and Good Lie Productions LLC then acquired further rights in the Screenplay from Outlaw and Nagle. Id. ¶ 72. Plaintiffs plead, on

information and belief, that all Corporate Defendants[3] obtained rights in the

Screenplay with notice of the JVA and its terms, including that no film could be

produced from the Screenplay without consent of and compensation to the Lost

Boys. Id. ¶ 73. Nonetheless, the Corporate Defendants, in conjunction with Nagle,

revised the screenplay and began to film *The Good Lie* in Atlanta in early 2013.

Id. ¶¶ 74-75. None of the Defendants contacted the Lost Boys to discuss their

compensation for, fundraising associated with, or consent to the film's

production before beginning to shoot the film. Id. ¶ 83.

The Lost Boys learned that the Screenplay was the basis for *The Good Lie*

when fellow Southern Sudanese refugees solicited to join the film as extras

recognized the script and brought it to their attention. Id. ¶¶ 77-78, 81-82. The

Lost Boys soon thereafter contacted the director of the film, Philippe Falardeau,

and producers for Black Label Media and Imagine Entertainment, Molly Smith

and Karen Sherwood, respectively, to discuss the JVA, arranging for a meeting on

April 15, 2013. Id. ¶¶ 84-85. The meeting was recorded via videotape and

microphone. Id. ¶ 85; Transcript of April 15, 2013 meeting, Ex. B to Motion to

Dismiss, Dkt. No. [9-4].[4]

---

[3] The Court will refer collectively to Defendants Alcon Entertainment, LLC, Imagine Entertainment, LLC, Good Lie Productions LLC, Black Label Media, LLC, and Reliance Big Entertainment (US), Inc. as the "Corporate Defendants."

[4] Defendant attaches to its Motion copies of the videotape of the April 15, 2013 meeting, the transcript of that meeting created at the direction and expense of Defendants, a DVD of the film *The Good Lie*, and proof of registration of the Foundation with the Secretary of State of the State of Georgia. Dkt. Nos. [9-3], [9-4], [9-5], [9-6]. These materials are referenced in the Complaint. Plaintiff has not

Smith and Sherwood confirmed that the screenplay for *The Good Lie* was a revised version of the Screenplay, but asserted that Nagle had informed them that the producers were only required to make a scholarship fund donation to produce the film. Id. ¶ 86. Smith agreed with the Lost Boys that their life stories were used in the Screenplay and that they should be compensated for their use. Id. ¶ 87. Smith and Sherwood, on behalf of the Corporate Defendants and Nagle, agreed to donate to the Foundation in an amount to be negotiated in good faith at a future date. Id. ¶¶ 88. Smith later offered the Lost Boys $1,000,000 to satisfy the JVA. Id. ¶ 90. Negotiations thereafter broke down, and counsel for certain of the Corporate Defendants denied any obligation to compensate Plaintiffs for their contributions to the Screenplay, denied the existence of the JVA, denied that Smith conceded that the Screenplay used the Lost Boys' life stories, asserted full ownership of the copyright for the Screenplay, and refused Plaintiffs' request to mediate their dispute. Id. ¶¶ 91-94.

*The Good Lie* trailer was released in June 2014 and included material from the Interviews. Id. ¶¶ 96-97. The Lost Boys recognized their personal experiences, conversations, jokes, expressions of faith, and other specific details and aspects of

---

challenged the authenticity of these documents, only their appropriateness for consideration at this stage of litigation. Therefore, and because the documents are central to Plaintiffs' allegations, the Court may consider these documents on Defendants' Motion without converting the Motion to a motion for summary judgment. Day v. Taylor, 400 F.3d 1272, 1275-76 (11th Cir. 2005) ("[T]he court may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed.") (citing Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002)).

their identities, from their life stories described in the Interviews in the final release of *The Good Lie*. Id. ¶¶ 98-116. Contemplating that litigation would be required, the Lost Boys irrevocably assigned all of their intellectual property rights in their respective life stories and all rights in their claims against Defendants to the Foundation. Id. ¶ 95.

Plaintiffs assert eighteen claims against Defendants, though not every claim applies against every Defendant. See id. ¶¶ 117-319.

Against Nagle, Outlaw, Newmyer's Estate, and Silver,[5] Plaintiffs allege causes of action for Breach of Joint Venture Agreement (Count I), Declaratory Judgment (Count II),[6] Injunctive Relief and Specific Performance (Count III), Breach of Fiduciary Duty (Count IV), Demand for Accounting (Count V), Conversion of Plaintiffs' Ideas (Count VI), Breach of the Duty of Good Faith and Fair Dealing (Count IX), Unjust Enrichment (Alternate Count XII), *Quantum Meruit* (Alternate Count XIV), Promissory Estoppel (Alternate Count XVI), and Fraudulent Inducement (Count XVII).

Against the Corporate Defendants (Alcon, Imagine, Black Label, Reliance, and GLP), Plaintiffs allege causes of action for Breach of Contract (Count VII), Breach of the Duty of Good Faith and Fair Dealing (Count X), Unjust Enrichment (Alternate Count XII), *Quantum Meruit* (Alternate Count XIV), Promissory Estoppel (Alternate Count XVI), and Fraudulent Inducement (Count XVIII).

---

[5] The Court will refer collectively to Defendants Nagle, Outlaw, the Estate of Robert "Bobby" Newmyer, and Silver as the "Screenplay Defendants."

[6] Plaintiffs do not plead Count II against Silver.

Against all Defendants, Plaintiffs allege a cause of action for Commercial Appropriation (Count VIII).

## III.  DISCUSSION

The Court will begin by examining Plaintiffs' claims arising under the Copyright Act and those claims Defendants argue are preempted by the Act. The Court will next turn to Plaintiffs' claims based on the alleged breach of the JVA and claims in the alternative to the breach of contract claim. The Court will then consider the remaining claims in the Complaint.

### A. Claims Concerning the Copyright Act

Count II of the Complaint demands a declaratory judgment on behalf of the Foundation (1) that the Lost Boys are joint authors of the Interviews entitled to share all exclusive rights in them with Nagle, the Estate, and Outlaw; (2) that these rights, having been assigned by each Lost Boy to the Foundation, allow the Foundation to prevent Nagle, the Estate, Outlaw, and their successors to create or license derivative works (such as *The Good Lie*) using the Lost Boys' original contributions to the Interviews; and (3) that Nagle, the Estate, and Outlaw shall pay Plaintiffs' attorneys' fees, costs, and expenses of litigation. Dkt. No. [1] ¶¶ 161-64. Count III seeks a mandatory injunction (1) directing the Screenplay Defendants to provide the Foundation with copies of the Interviews and of the Screenplay so that the Foundation can submit a valid application to register its copyright in each; (2) preventing the Screenplay Defendants from infringing on Plaintiffs' rights in the Interviews or in the Screenplay by registering their

copyright in each without either naming the Lost Boys as co-authors or obtaining permission from the Foundation; (3) preventing the Screenplay Defendants from infringing on Plaintiffs' copyright in the Screenplay without giving credit to or obtaining permission from the Foundation; and (4) directing the Screenplay Defendants to pay Plaintiffs' attorneys' fees, costs, and expenses. Id. ¶¶ 171-75. In sum, Plaintiffs seek the Court's enforcement of their unprotected, unregistered copyrights in the Interviews, and accordingly, in the Screenplay and in *The Good Lie*, both of which incorporate the original work of the Interviews.

### 1. Plaintiffs Cannot State a Claim under the Declaratory Judgment Act Without First Registering Their Copyrights

The federal Declaratory Judgment Act ("DJA") provides that "any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. The DJA "does not provide a source of jurisdiction which is independent of substantive federal law." Gibraltar, P.R., Inc. v. Otoki Grp., Inc., 104 F.3d 616, 619 (4th Cir. 1997) (citing Franchise Tax Bd. of State of Cal. v. Constr. Laborers Vacation Trust for S. Cal., 463 U.S. 1, 16 n.14 (1983)). Rather, the operation of the DJA "is procedural only. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 671 (1950) (citation and internal quotation marks).

In a declaratory judgment action, as the Supreme Court has explained, "the realistic position of the parties is reversed." <u>Pub. Serv. Comm'n of Utah v. Wycoff Co.</u>, 344 U.S. 237, 248 (1952). Subject matter jurisdiction in a declaratory judgment action is based upon whether Defendants could have initially brought in federal court the threatened action for which declaratory relief is sought. <u>Id.</u> ("If the cause of action, which the declaratory defendant threatens to assert, does not itself involve a claim under federal law, it is doubtful if a federal court may entertain an action for a declaratory judgment establishing a defense to that claim.").

The Court must therefore determine (1) whether an actual controversy exists, as required by 28 U.S.C. § 2201(a); and (2) whether the character of the alleged threatened action by Defendants would raise a federal question and thus establish the requisite subject matter jurisdiction. The issue in determining whether an actual controversy exists is "whether the facts alleged, under all circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." <u>Maryland Cas. Co. v. Pacific Coal & Oil Co.</u>, 312 U.S. 270, 273 (1941).

Defendants argue that Plaintiffs are not entitled to a declaratory judgment for several reasons. Defendants insist that Plaintiffs' copyright-based claims should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). Dkt. No. [9-1] at 19-20, Dkt. No. [23] at 19-21. This argument is made even while

acknowledging that <u>Reed Elsevier, Inc. v. Muchnick</u>, 559 U.S. 154 (2010), determined that registration of copyright was an element of a copyright infringement claim, and not a jurisdictional requirement. Based upon <u>Reed Elsevier</u>, the Court concludes it has jurisdiction over Plaintiffs' copyright claims.[7]

Regarding Defendants' arguments for dismissal of Plaintiffs' copyright-based claims under Rule 12(b)(6), Defendants first argue that Plaintiffs cannot proceed because they failed to register their copyrights. In response, Plaintiffs argue that they cannot register for a copyright in either the Interviews or the Screenplay because they lack copies of either to deposit with the Office of Copyright. Dkt. No. [1] ¶¶ 57, 173-74; Dkt. No. [9] at 19-20. Section 408 (b) of Title 17 of the United States Code provides that "the owner of copyright or of any exclusive right in the work [for which copyright protection is sought] may obtain registration of the copyright claim by delivering to the Copyright Office the deposit ... together with the application and fee" provided for by the Copyright Act. 17 U.S.C. § 408(a). The Act specifies, absent exceptions not applicable here, that at least one copy of the work be given to the Copyright Office at the time of application for protection. <u>Id.</u> § 408(b).

---

[7] The Court also has jurisdiction under 28 U.S.C. § 1338, which provides federal district courts with original jurisdiction over any civil action "arising under any Act of Congress relating to ... copyrights." <u>See</u> 1mage Software, Inc. v. Reynolds & Reynolds Co., 459 F.3d 1044,1050-51 (10th Cir. 2006) (action arises under Copyright Act for purposes of subject matter jurisdiction under Section 1338 where a complaint asserts a claim requiring construction of the Copyright Act).

Plaintiffs allege that they are rightful co-owners of an original joint work of authorship (the Interviews) and of a derivative work that makes use of the original work (the Screenplay), but cannot sue for copyright infringement against the Screenplay Defendants because they lack possession of a copy of the Interviews (which have never been registered), and so cannot submit a valid registration application. Id. § 411(a) ("no civil action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made in accordance with this title.").[8]

Although section 408(a) states that "[s]uch registration is not a condition of copyright protection," copyright holders generally must register their works before suing for copyright infringement. Dowbenko v. Google Inc., 582 F. App'x 801, 805 (11th Cir. 2014) (citing § 411(a)). In Stuart Weitzman, LLC v. Microcomputer Res., Inc., the Eleventh Circuit held that copyright registration is a prerequisite to a declaratory judgment action to determine both infringement and ownership under the Copyright Act. 542 F.3d 859, 862-63 (11th Cir. 2008), *abrogated in part by* Reed Elsevier. As it is undisputed that the DJA does not confer jurisdiction and "is procedural only," Household Bk. v. JFS Group, 320

---

[8] An exception exists where the prospective copyright owner has completed an application to register and that application is denied, but a complete application must include the deposit. 17 U.S.C. § 411(a) ("In any case, however, where the *deposit*, application, and fee required for registration *have been delivered* to the Copyright Office in proper form *and* registration has been refused, the applicant is entitled to institute a civil action for infringement if notice thereof, with a copy of the complaint, is served on the Register of Copyrights.") (emphasis added). The only work at issue in this lawsuit that Plaintiffs allege has been registered is the film, *The Good Lie*. Dkt. No. [1] ¶ 153 n.2.

F.3d 1249, 1253 (11th Cir. 2003) (citation omitted), registration of copyright ordinarily is required to state a claim for a declaratory judgment of ownership rights in a copyrightable work.

Plaintiffs argue that Defendants should be equitably estopped from arguing for dismissal due to Plaintiffs' failure to register the Interviews. Plaintiffs reason that, because their failure to register the Interviews is due solely to Defendants' refusal to provide a copy to them to deposit, Plaintiffs should not suffer the harm resulting (and Defendants should not benefit) from their malfeasance. Dkt. No. [16] at 20-22. Plaintiffs, however, also cannot point to any precedent for applying equitable estoppel in this unusual posture. As Defendants note, equitable estoppel has only been used as a defense by accused infringers highlighting a plaintiff's detrimental, misleading conduct regarding her intentions to file an infringement action. See Dkt. No. [23] at 21 (citing Petrella v. Metro-Goldwyn-Mayer, Inc., 134 S. Ct. 1962 (2014); John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26 (1st Cir. 2003); Legislator 1357 Ltd. v. MGM, 452 F. Supp. 2d 382 (S.D.N.Y. 2006)).

The few courts to consider applying equitable estoppel against a defendant arguing for dismissal based on the plaintiff's failure to register a copyright have expressed doubts about its application. In Markantone v. Podiatric Billing Specialists, LLC, 559 F. App'x 459 (3d Cir. 2015), a podiatrist and his medical practice filed a copyright infringement lawsuit claiming a vendor was unlawfully withholding his medical and practice data. The podiatrist acknowledged that he

had never registered a copyright in his data, but argued that the Court should excuse the registration requirement due to "the purported Catch-22" constraining him, as he could not file an infringement lawsuit without registering, but he also could not register the copyright without obtaining the medical data withheld by the vendor, requiring him to file suit. Id. at 459. The Third Circuit, noting the absence of authority for granting "what amounts to an equitable exception to the mandatory registration requirement," declined to allow the plaintiff "to pursue a state-law breach of contract claim under federal copyright law." Id.

In Brainstorm Interactive, Inc. v. Sch. Specialty, Inc., No. 14-CV-50-WMC, 2014 WL 6893881 (W.D. Wis. Dec. 5, 2014), meanwhile, the court expressed confusion as to when "an author or owner of copyrightable work [would] *not* be able to register (or even preregister) the copyright before filing suit." Id., 2014 WL 6893881 at *11 (emphasis in original). The Brainstorm court found no support for the plaintiff's proposed application of equitable estoppel to the registration requirement, and also found that the plaintiffs could have taken steps to register or protect their copyright earlier. Id. at *11-13; see also Jones v. W. Plains Bank & Trust Co., No. 1:12CV00052-SWW, 2014 WL 4232391, *2 (E.D. Ark. Aug. 27, 2014) (declining to waive registration requirement where defendant had control of tapes of original musical compositions at the time plaintiff filed suit, which prevented plaintiff from registering compositions for copyright, and finding that plaintiff's remedy was a motion to amend his complaint upon obtaining and registering the compositions).

The Court recognizes that, in a declaratory judgment action concerning ownership of copyrightable materials, the plaintiff seeking relief usually also seeks protection against a future infringement lawsuit filed by the defendant. In other words, the declaratory plaintiff stands in the shoes of an infringement defendant. In that posture, Plaintiffs are akin to the defendants to a future copyright infringement lawsuit, and so would stand to benefit from the more traditional application of equitable estoppel in that future lawsuit, and thus should also benefit in this action. While the Court appreciates the logic of Plaintiffs' argument, they have not pointed to authority applying equitable estoppel to the *registration* requirement specifically.

Plaintiffs' claims would arise in a more straightforward manner as an action for infringement of their copyright in the Screenplay and in *The Good Lie*, as both are alleged to be derivative works of the Interviews. As Plaintiffs have not registered their copyright in the Interviews, because they do not have and cannot secure from Defendants a copy to deposit, they cannot maintain such an action. On the facts alleged, this leaves Plaintiffs with unenforceable copyright protections. Notwithstanding its appeal, their equitable estoppel argument is contrary to the Copyright Act and without precedential support. Generally, "lower courts do not have the luxury of deciding what the law 'should be,' but are instead governed by what the law 'is.'" U.S. Bk. Nat'l Ass'n v. Coop. Dist. of the City of Spanish Fort—Highway 98 Pub. Facilities, No. 11-0401-WS-M, 2011 WL 4499309, *4 (S.D. Ala. Sept. 29, 2011). The law applicable here is that one may

not file an action for copyright infringement without first registering the copyright, which Plaintiffs have not done.

Accordingly, the Court does not reach the parties' remaining arguments over Plaintiffs' Copyright Act claims, and **GRANTS** Defendants' Motion to dismiss Plaintiffs' claim for a declaratory judgment based on their asserted copyright rights (Count II). The Court will allow Plaintiffs leave to re-file their Copyright Act claim should they successfully register their copyrights in the future, or if a valid registration application is denied by the Register of Copyright. See Burruss v. Zolciak-Biermann, No. 1:13-cv-789-WSD, 2013 WL 5606667, *3 (N.D. Ga. Oct. 11, 2013) (a "plaintiff asserting a claim for copyright infringement must [prove or] allege, that the copyrighted work is registered .... Absent that evidence or allegation, the copyright claim is required to be dismissed, but without prejudice to the filing of an action after the registration is made.").

### 2. Plaintiffs May Pursue Injunctive Relief

Defendants rest their argument to dismiss Plaintiffs' claim for injunctive relief and specific performance (Count III) on their arguments to dismiss Plaintiffs' claim for a declaratory judgment. See Dkt. No. [9-1] at 20, 23, Dkt. No. [23]. Although Plaintiffs cannot sustain their declaratory judgment action because they cannot apply to register their copyrights, that does not deprive the alleged copyrights of all protection. See 17 U.S.C. § 408(a) ("registration is not a condition of copyright protection"). The Copyright Act permits "[a]ny court having jurisdiction of a civil action arising under this title ... [to] grant temporary

and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of *a copyright*." 17 U.S.C. § 502(a) (emphasis added). This "power to grant injunctive relief is not limited to registered copyrights, or even to those copyrights which give rise to an infringement action." Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345, 1349 (8th Cir. 1994) (citing Pac. & S. Co. v. Duncan, 744 F.2d 1490, 1499 n.17 (11th Cir. 1984), *cert. denied*, 471 U.S. 1004 (1985)). Rather, "[c]ourts have traditionally crafted broad injunctions to protect copyright holders, regardless of the registration status of the copyright," even including future works "not yet in existence" and so incapable of registration. Olan Mills at 1349 (citing Duncan, 744 F.2d at 1499 & n.17).[9]

The Court therefore may grant injunctive relief despite Plaintiffs' inability to register for copyright. The Court will consider whether the Complaint states facts sufficient to establish copyright infringement and Plaintiffs' entitlement to injunctive relief as a remedy should Plaintiffs prove those facts.

       i.   Plaintiffs State Facts Supporting Copyright Infringement

---

[9] See Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1154 n.1 (9th Cir. 2007) (recognizing that "the court may grant injunctive relief to restrain infringement of any copyright, whether registered or unregistered" so long as it has jurisdiction); Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc., No. 12-CV-00954-AW, 2013 WL 3967934, *2 (D. Md. July 31, 2013) ("the Court's power to grant injunctive relief in this case is not limited to registered copyrights"); Foraste v. Brown Univ., 248 F. Supp. 2d 71, 77-78 (D.R.I. 2003) ("It is also clear that a failure to register is certainly not fatal to the [p]laintiff's alleged substantive interest in the copyright of the images. ... [I]t would be wholly inequitable to require that [plaintiff], prior to proceeding with this action, register a copyright in images to which [defendant] presently denies him access.").

In addition to asserting that Plaintiffs cannot state an infringement claim without first registering for copyright, Defendants challenge Plaintiffs' infringement allegations on three grounds. Dkt. No. [9-1] at 20-23. Defendants first argue that Plaintiffs' copyrightable contributions to the Interviews are not fixed in a tangible medium of expression, and so they may not bring a copyright claim. Id. at 20. (citing 17 U.S.C. § 102(a)). This argument ignores Plaintiffs' plausible allegation that the Interviews were tape-recorded and so were able to be "reproduced ... with the aid of a machine or device." § 102(a); see Dkt. No. [1] ¶¶ 57, 145-46; Dkt. No. [19] at 22-23.

Defendants next claim that the Interviews cannot constitute an original work of authorship because "an interviewee cannot claim copyright protection for his answers in an interview." Dkt. No. [9-1] at 21-22. The Interviews, however, did not consist merely of "ideas, facts and opinion made during a conversation," like the interviews by journalists in the cases Defendants cite. Id. (citing Falwell v. Penthouse Int'l, Ltd., 521 F. Supp. 1204 (W.D. Va. 1981) and Taggart v. WMAQ Channel 5 Chicago, Case No. 00-4205-GPM, 2000 WL 1923322 (S.D. Ill. Oct. 30, 2000)). Rather, the Interviews were a creative process designed to create material for a screenplay and film. Dkt. No. [1] ¶¶ 37-40, 50, 131, 140. All that an "original work" must possess is "'some minimal degree of creativity' ... even a slight amount will suffice." Durkin v. Platz, 920 F. Supp. 2d 1316, 1340 (N.D. Ga. 2013) (citing Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 345 (1991)). Plaintiffs' telling of their personal stories in response to questions designed to

elicit material to create a fictional script for a feature film likely includes enough creativity to render the Interviews an original work of authorship.

Defendants also claim that the Interviews were not a "joint work" of authorship because Plaintiffs do not allege that the Lost Boys and Nagle, Newmyer, and Outlaw intended to create a joint work when they each contributed to the Interviews. Dkt. No. [9-1] at 22-23. The relevant "intent" regarding the creation of a "joint work" is "the intention that [the parties'] contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101; Janky v. Lake Cty. Convention & Visitors Bureau, 576 F.3d 356 (7th Cir. 2009) ("[T]he intent prong does not have to do with the collaborators' intent to recognize each other as co-authors for purposes of copyright law; the focus is on the parties' intent to work together in the creation of a single product, not the legal consequences of that collaboration.")

As noted above, Plaintiffs plead that the Lost Boys and Nagle, Newmyer, and Outlaw intended that the Interviews include material for use in a script for a film, to be owned by their Joint Venture. Dkt. No. [1] ¶¶ 37-40, 50, 131-32, 140. Plaintiffs further plead that the interplay between prompts and responses in the Interviews necessarily merged the respective contributions of the Lost Boys, Nagle, Newmyer, and Outlaw into inseparable parts of a whole. Id.  ¶¶ 39-40, 135. Defendants' focus on the principle that "the intent of the contributors to a work is relevant and significant" is accurate. Dkt. No. [9-1] at 23 (citing Gordon v. Lee, No. CIV A 105-CV-2162-JF, 2007 WL 1450403, *8 (N.D. Ga. May 14, 2007)).

Their claim that Plaintiffs fail to plead facts supporting an intention to create a joint work, however, overlooks the allegations of the Complaint emphasizing the importance of contributions of all parties participating in the Interviews to the Screenplay and film to come. Cf. M.G.B. Homes, Inc. v. Ameron Homes, Inc., 903 F.2d 1486, 1493 (11th Cir. 1990) (finding absence of "evidence that it was the intent of either [contributor] that this concept (the sketch) become part of the finished expression (the architectural plans and drawings)" barred contributor of the sketch from claiming joint authorship of architectural plans and drawings).

Plaintiffs have alleged that the Interviews are a joint work. They accordingly state facts sufficient to show copyright infringement.

> ii.  Plaintiff State Facts Supporting Entry of a Permanent Injunction

Plaintiffs must also state facts supporting their claim to injunctive relief. Under well-established principles of equity, a plaintiff seeking a permanent injunction must demonstrate: (1) irreparable injury; (2) remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) a remedy in equity is warranted when considering the balance of hardships; and (4) the public interest would not be disserved by a permanent injunction. eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006). The Complaint meets these elements.

First, Plaintiffs plead that the Screenplay Defendants will cause irreparable harm in the future by infringing on Plaintiffs' copyright in the Interviews through seeking to register the Screenplay Defendants' copyright in the Interviews or the

Screenplay, as Black Label has registered copyright in *The Good Lie*. Dkt. No. [1] ¶¶ 153 n.2, 171-72. Plaintiffs also plead that they would be irreparably harmed by their inability to register their copyrights because they do not possess copies of the copyrightable materials solely within the possession of Defendants. Id. ¶¶ 57, 175. These facts sufficiently state irreparable harm supporting entry of a permanent injunction.

Second, Plaintiffs plausibly plead they lack adequate remedies at law for their inability to register for copyrights and for Defendants' present and likely future infringement of their copyrights. Plaintiffs allege facts showing that they have not been able to secure copies of the Interviews. Dkt. No. [1] ¶¶ 57, 173-74. Plaintiffs plead they have no adequate remedy at law for future infringement because injury due to that infringement "cannot be fully compensated or measured in money." Arista Records, Inc. v. Beker Enters., Inc., 298 F. Supp. 2d 1310, 1314 (S.D. Fla. 2003).

Third, as noted above, Plaintiffs plead that they will suffer harm in the absence of injunctive relief. Defendants do not argue that the Screenplay Defendants will suffer any harm from the entry of an injunction requiring that they give Plaintiffs copies of the Interviews or of the Screenplay, or that they not register their copyrights in the Interviews or in the Screenplay. See Broad. Music, Inc. v. PRB Prods., Inc., No. 6:13-CV-1917-ORL-31, 2014 WL 3887509, *5-6 (M.D. Fla. Aug. 7, 2014) (observing that defendants raised no "legally cognizable harm worthy of the Court's protection" that would result from entry of plaintiff's

requested injunction). The balance of hardships therefore plausibly weighs in favor of injunctive relief.

Finally, the public interest favors the protection of copyrights, and so also favors entry of a permanent injunction. See CCA & B, LLC v. F + W Media Inc., 819 F. Supp. 2d 1310, 1330 (N.D. Ga. 2011).

"When a copyright owner has established a threat of continuing infringement, the owner is entitled to an injunction regardless of registration." Olan Mills, 23 F.3d at 1349 (citation omitted). Plaintiffs have stated a cognizable claim for protection against continuing infringement by Defendants that, if proven, warrants entry of a permanent injunction. The Court accordingly declines to dismiss Plaintiffs' injunctive relief claim at this time (Count III).

### B. Preemption of Claims under the Copyright Act

Defendants claim that Plaintiffs' unjust enrichment, *quantum meruit*, and conversion claims are entirely preempted by the Copyright Act. Dkt. No. [9-1] at 26-29. Claims alleging the violation of rights "within the subject matter of copyright" and "within the general scope of copyright" are preempted by the Copyright Act. 17 U.S.C. §§ 102, 103, 106, 301(a). Claims come within the subject matter of copyright when, among other things, the claims concern original works of authorship or works derivative of such original works that are fixed in tangible media of expression. 17 U.S.C. §§ 102, 103. Claims fall outside the general scope of copyright, and thus are not preempted, when "an extra element is required instead of or in addition to the acts of reproduction, performance, distribution or

display, in order to constitute a state-created cause of action." <u>Foley v. Luster</u>, 249 F.3d 1281, 1285 (11th Cir. 2001) (quoting <u>Computer Assoc. Int'l, Inc. v. Altai, Inc.</u>, 982 F.2d 693, 716 (2d Cir. 1992)).

### 1. The Unjust Enrichment and *Quantum Meruit* Claims are Not Preempted

Defendants argue that the Copyright Act preempts Plaintiffs' unjust enrichment and *quantum meruit* claims because the conferred benefits or services consisted solely of the copyrightable materials in the Interviews. Dkt. No. [9-1] at 26-27, Dkt. No. [23] at 17-18. Plaintiffs, however, expressly plead these claims (Counts XI, XII, XIII, and XIV) in the alternative to their *contract* claims, and seek relief for Defendants' failure to compensate them for their performance of benefits and services should the Court find no contract exists. Dkt. No. [1] ¶¶ 243-75 (concerning lack of compensation for Lost Boys' "assistance" with the script and performance of "services valuable" to Defendants); Dkt. No. [19] at 28-29.

To state an unjust enrichment claim in Georgia, a plaintiff must "show that (1) a benefit was provided, (2) compensation for that benefit was not received, and (3) the failure to compensate renders the transaction unjust." <u>Ralls Corp. v. Huerfano River Wind, LLC</u>, 27 F. Supp. 3d 1303, 1329 (N.D. Ga. 2014) (citation omitted). Similarly, to establish a *quantum meruit* claim, a plaintiff must show (1) performance of valuable services, (2) either at the request of the defendant or with knowing acceptance, (3) with the expectation of compensation at the time the services were rendered, and (4) the injustice of the defendant's receipt of the

services without providing compensation. <u>Synergy Worldwide, Inc. v. Long, Haymes, Carr, Inc.</u>, 44 F. Supp. 2d 1348, 1358 (N.D. Ga. 1998). The doctrines apply "when, as a matter of fact, there is no legal contract." <u>Marvin Hewatt Enterprises, Inc. v. Butler Capital Corp.</u>, 761 S.E.2d 857, 863 (Ga. Ct. App. 2014) (unjust enrichment); <u>Synergy Worldwide</u>, 44 F. Supp. 2d at 1358 (*quantum meruit*).

To show unjust enrichment or *quantum meruit* by Defendants, then, Plaintiffs must demonstrate that Defendants' receipt of benefits or services from Plaintiff was unjust – an element beyond the "reproduction, performance, distribution, or display" of Plaintiffs' copyrightable works required to show copyright infringement. Both the unjust enrichment and *quantum meruit* claims have elements that meet the "extra element" requirement, and therefore are not preempted. <u>See</u> <u>PHA Lighting Design, Inc. v. Kosheluk</u>, No. 1:08-CV-01208-JOF, 2010 WL 1328754, *10 (N.D. Ga. Mar. 30, 2010) ("The Copyright Act requires no such showing that the unauthorized copying unjustly enriched the copier.") (citation omitted); <u>see also</u> <u>Butler v. Cont'l Airlines, Inc.</u>, No. CIV.A. 01-2194, 2001 WL 1509545, *3 (S.D. Tex. Nov. 19, 2001) ("equitable claims relating to breach of contract ... [including] *quantum meruit* ... satisfy the extra element test," as "the claims are based on a contractual arrangement between the parties, instead of centering on the unauthorized use of" copyrightable material and the "claims arise from rights under the agreement").

## 2.  The Conversion Claim is Preempted as to Copyrightable Material, But Not as to Ideas, as Plaintiffs Plead

The Complaint alleges that Defendants converted Plaintiffs' ideas, by "wrongfully us[ing] an idea shared by the [P]laintiff[s] without permission or compensation." Dkt. No. [1] ¶ 195. To state a claim for conversion of an idea under Georgia law, a plaintiff must allege that (1) the idea is novel, (2) disclosure of the idea was made in confidence, (3) the defendant "adopted and made use of the idea," and (4) the idea is "sufficiently concrete in its development to be usable." Wilson v. Barton & Ludwig, Inc., 296 S.E.2d 74, 77 (Ga. Ct. App. 1982).

Defendants argue that the subject matter of Plaintiffs' conversion claim necessarily falls within the subject matter and scope of copyright, asserting that "the alleged theft of intangible ideas is almost universally preempted by the Copyright Act." Dkt. No. [9-1] at 25 (citing Murray Hill Publ'ns, Inc. v. ABC Commc'ns, Inc., 264 F.3d 622, 635-36 (6th Cir. 2001)). While Murray Hill accurately states the law of the Sixth Circuit and elsewhere, the Eleventh Circuit takes a minority view,[10] holding that

> the subject matter of copyright, in terms of preemption, includes only those elements that are substantively qualified for copyright protection. Therefore, because ideas are substantively excluded from the protection of the Copyright Act, they do not fall within the subject matter of copyright: "[t]he assertion that an element which is not protected by copyright is included in the subject matter of copyright is completely illogical." ... Thus, we conclude that a plaintiff's claim for conversion of his ideas—even original ideas

---

[10] See Spear Mktg., Inc. v. BancorpSouth Bk., 791 F.3d 586, 595-96 (5th Cir. 2015) (comparing Dunlap with case law from other courts of appeal).

expressed in a tangible medium—is not preempted by the Copyright Act.

Dunlap v. G&L Holding Grp., Inc., 381 F.3d 1285, 1295, 1297 (11th Cir. 2004) (citations and footnote omitted). Because ideas are substantively ineligible for copyright protection, a claim for conversion of ideas is not preempted by the Copyright Act. Id. at 1297 (citing 17 U.S.C. § 102(b)). Defendants' preemption argument thus fails.

Defendants make no other argument against the conversion claim in briefing their Motion. Plaintiffs' factual allegations meet the elements of a conversion claim under Georgia law, including that their life stories and personal experiences are novel ideas not subject to copyright protection or preemption.[11] Because Defendants have not shown that Plaintiffs fail to state a cognizable claim for conversion, Defendants' Motion to dismiss the conversion claim is denied.

---

[11] Plaintiffs characterize their conversion claim as "alternative" to their copyright claim. See Dkt. No. [19] at 29 n.2 (asserting that the "alternative conversion claim is not preempted" insofar as their life stories and personal experiences are not protected by copyright). The Court construes allegations in the non-movant's favor when considering a motion to dismiss, and so for purposes of applying the Motion to the conversion claim assumes that Plaintiffs' life stories and personal experiences are ideas. Ctr. for Transp. & the Env't, Inc. v. Georgia Aquarium, Inc., No. 1:05CV2790-CAP, 2006 WL 278389, *3 (N.D. Ga. Feb. 1, 2006) (reading conversion claim as based on non-copyrightable subject matter for purposes of ruling on motion to dismiss); cf. Polsby v. St. Martin's Press, Inc., No. 97 CIV. 690 (MBM), 1999 WL 225536, *4 (S.D.N.Y. Apr. 19, 1999) ("It is a fundamental principle of copyright law that copyright protection extends only to an author's particular expression of facts or ideas, not to the facts and ideas themselves. To use plaintiff's formulation, it was not plaintiff's 'experiences,' but only her particular description of them, that was protected by copyright.") (citations omitted), aff'd, 8 F. App'x 90 (2d Cir. 2001).

### C. **Claims Concerning Breach of the 2003 Joint Venture Agreement**

Plaintiffs bring six causes of action rooted in an alleged oral contract between the Lost Boys and Newmyer, Nagle, and Outlaw. Four claims – breach of contract (Count I), breach of fiduciary duty (Count IV), a demand for an accounting (Count V), and breach of the duty of good faith and fair dealing (Count IX) – are brought against the Screenplay Defendants. Plaintiffs raise two additional claims – breach of contract (Count VII) and breach of the duty of good faith and fair dealing (Count X) – against the Corporate Defendants, whom Plaintiffs argue knowingly succeeded to Newmyer, Nagle, and Outlaw's obligations when they acquired the production rights to the Screenplay. Plaintiffs also allege three additional causes of action in the alternative against the Screenplay Defendants and the Corporate Defendants, respectively, asking the Court to find that Plaintiffs remain entitled to relief under the equitable theories of unjust enrichment (Counts XI and XII), *quantum meruit* (Counts XIII and XIV), and promissory estoppel (Counts XV and XVI), even if the Court concludes no contract was formed. The Court now turns to Defendants' arguments in support of dismissal.

### 1. **Claims Raised By Specific Plaintiffs or Against Specific Defendants**

#### i. Claims Against Deborah Newmyer as Successor to and "Executrix" of the Estate of Bobby Newmyer Should Survive Defendants' Motion

Plaintiffs bring several causes of action against Deborah Jelin Newmyer as "executrix" of the estate of Bobby Newmyer (the "Estate"). Dkt. No. [1] at 3 & ¶ 11. Defendants object to this lawsuit, claiming that the statute of limitations under California law should bar Plaintiffs' claims against the Estate. Dkt. No. [9-1] at 11. Plaintiffs contend that Georgia's choice-of-law rules must apply, and that they compel the application of Georgia law to this case, under which Plaintiffs' claims against the Estate are timely. Dkt. No. [19] at 10-11.

Plaintiffs are correct. Federal courts sitting in diversity apply the forum state's choice-of-law rules – here, Georgia's. <u>Boardman Petroleum, Inc. v. Federated Mut. Ins. Co.</u>, 135 F.3d 750, 752 (11th Cir. 1998). Georgia courts recognize that state statutes of limitations are inherently procedural questions, meaning that the law of the forum state should apply. <u>Lloyd v. Prudential Sec. Inc.</u>, 438 S.E.2d 703, 704-05 (Ga. Ct. App. 1993). Under Georgia's applicable four-year statute of limitations, Plaintiffs' claims based on contract began to run when Defendants began making *The Good Lie* in 2013. Dkt. No. [1] ¶¶ 76, 82-83, Dkt. No. [19] at 11-12.

Defendants also argue that claims against the estate of a deceased party are improper because shorter limitations periods in non-forum states can bar actions that the forum state would otherwise allow. Dkt. No. [9-1] at 12. Thus, Defendants claim, even if the four-year statute of limitations for contact actions under Georgia law only began to run in 2013, a lawsuit against the Estate remains improper under applicable California civil procedure and probate law. Dkt. No.

[23] at 11-13. Defendants rely only on Restatements concerning the conflict of laws and point to no Georgia borrowing statute that would apply here. Cf. <u>Thea v. Kleinhandler</u>, 807 F.3d 492, 499 (2d Cir. 2015) ("New York Law requires that an action accruing outside the state *must* meet the statutes of limitations of both jurisdictions. ... Hence, it appears that *under New York's borrowing statute*, the one-year California statute of limitations [under Section 366.3] controls this action.") (emphasis added). Defendants' reliance on <u>Kapila v. Belotti</u> is likewise inapt, because the plaintiff bankruptcy trustee there had filed a cause of action that had accrued prior to the death of the defendants, and proceeded to fail to re-file his claims as required by California probate law. No. 6:07-bk-00761-KSJ, 2012 Bankr. LEXIS 2858, *6-8 (Bankr. M.D. Fla. June 18, 2012). Here, Plaintiffs' claims did not accrue until several years after Newmyer died.

Even if the Court were to look to California law, the provision Defendants cite imposing a shorter statute of limitations, California Code of Civil Procedure Section 366.3,[12] "gives persons who have claims against estates based on promises to make a distribution after death (such as contracts to make a will) a full year from the date of the decedent's death to file suit." <u>Allen v. Stoddard</u>, 212 Cal. App. 4th 807, 811-12 (Jan. 9, 2013), *modified, reh'g denied* (Feb. 1, 2013). Unlike the plaintiff in <u>Allen</u>, Plaintiffs are not suing the Estate based on

---

[12] <u>Kapila</u> considers California Code of Civil Procedure § 366.2, not § 366.3, further distinguishing its applicability to Defendants' argument. Defendants belatedly cite to Section 366.2 in their Reply (Dkt. No. [23] at 12). On their face, both provisions appear to operate in similar fashion with regard to statutes of limitation.

Newmyer's promise that his Estate would provide for them after his passing. Though claims against an estate in California often arise in the guise of a breach of contract action, see Allen, 212 Cal. App. 4th at 812 (collecting cases), not all breach of contract actions against a deceased party fall under cases governed by Section 366.3. See In re Estate of Ziegler, 187 Cal. App. 4th 1357, 1364 (Aug. 31, 2010), *reh'g denied* (Sept. 27, 2010) (Section 366.3 "has been construed to reach any action predicated upon the decedent's agreement to distribute estate or trust property in a specified manner.") (quotation omitted). Here, Plaintiffs do not seek a "distribution after death," but damages for breach of a contract in which Newmyer allegedly agreed to work with Plaintiffs to obtain compensation and charitable donations from a third party that would make a film based on a script meeting Plaintiffs' approval.

Defendants have not shown that Plaintiffs' claims against the Estate disturb California's regime for orderly probate distribution as a matter of law, or that California law applies at all.[13] The Court declines to dismiss Plaintiffs' claims against the Estate based upon these reasons.

---

[13] Defendants contend that even if Georgia law, rather than California law, applies, claims against the Estate are improper because Georgia law forbids filing suit against a deceased party. Dkt. No. [9-1] at 12. Defendants rely on cases in which the plaintiff neglected to substitute the real party in interest after the original defendant passed. See Dkt. No. [19] at 12. By naming Deborah Newmyer as the defendant and real party in interest in the Estate, Plaintiffs have named the real party in interest. To the extent the Estate argues that it no longer exists, or that Deborah Newmyer is not the proper administrator or executor of that estate, those arguments are defenses properly raised in an Answer, not in a motion to dismiss.

ii.  The Individual Plaintiffs' Assignments of Claims to the
Foundation are Valid for Purposes of the Motion

Defendants also claim that Plaintiffs have not pleaded valid assignments of

the claims of the individual Lost Boys to the Foundation, as assignments of

claims must be in writing under Georgia law to take effect. Dkt. No. [9] at 12-13.

Defendants' objections properly state the law, but are misplaced here. First, the

individual Lost Boys are also Plaintiffs, rendering any question of whether they

assigned their claims academic for purposes of the Motion. Second, as Plaintiffs

note, they are not required to plead the validity of their assignments to survive a

Rule 12 motion. Dkt. No. [19] at 13-14; see, e.g., La Grasta v. First Union Sec.,

Inc., 358 F.3d 840, 845 (11th Cir. 2004). Third, Plaintiffs include copies of the

written assignments of each Plaintiff as exhibits[14] to their responsive brief

opposing the Motion. Dkt. No. [19] at 13, Composite Exhibit A to Declaration of

Jason Graham, Dkt. No. [19-1].

iii.  The Corporate Defendants' Other Arguments Fail

For similar reasons, the Corporate Defendants' argument that Plaintiffs

have no privity of contract with them is meritless. Dkt. No. [9] at 30-32. Plaintiffs

allege that the Corporate Defendants took production rights for the Screenplay

based on the Interviews with notice of the obligations of the Screenplay

Defendants and of Paramount (their intermediate successor). Dkt. No. [1] ¶ 73

("Upon information and belief, Reliance, Imagine, Alcon Entertainment, Black

---

[14] The Court may consider the written assignments because they are central to
Plaintiffs' claims and not questioned as inauthentic. See fn 4 supra.

33

Label and GLP … were aware of and assumed the responsibilities and obligations under the Joint Venture Agreement during the various transfers of ownership and production interests in the Screenplay."), ¶ 236 (the Corporate Defendants "acknowledged and adopted the Joint Venture Agreement"). Defendants' arguments to the contrary ignore these facts as pleaded. The attempt to distinguish the acquisition of production rights, alleged to have been contingent on the fulfillment of contractual obligations, from the contractual obligations themselves is not persuasive. Dkt. No. [23] at 6-7 & n.1.

Likewise, Defendants' plea that the Complaint fails to parse which claims apply against each Corporate Defendant ignores Plaintiffs' allegations, taken as true on a motion to dismiss, that *all* of them took the production rights with notice of the Joint Venture Agreement, and so *all* of them acceded to the obligations included in that Agreement. Dkt. No. [1] ¶¶ 69, 73.[15]

### 2. Claims Based on the Existence of an Oral Contract

Defendants also argue that Plaintiffs' oral contract claims fail as a matter of law. To succeed on a breach of contract claim, a party must demonstrate (1) an enforceable contract, (2) a breach of the contract, and (3) resulting damages to the party who has the right to complain about the breached contract. Norton v. Budget Rent A Car Sys., Inc., 705 S.E.2d 305, 306 (Ga. Ct. App. 2010). In

---

[15] The Corporate Defendants also submit arguments against Plaintiffs' claims pleaded in the alternative to contract and for fraudulent inducement. Dkt. No. [9-1] at 31-33. The Court considers the merits of those arguments in Sections III.C.3 and III.D infra.

Georgia, an oral contract is enforceable where the parties are competent to contract, the subject matter of the contract and consideration are present, and the parties agree on all material terms. O.C.G.A. § 13-3-1; see Turner Broad. Sys., Inc. v. McDavid, 693 S.E.2d 873, 877 (Ga. Ct. App. 2010); Cline v. Lee, 581 S.E.2d 558, 562 (Ga. Ct. App. 2003). Where material terms are left to later negotiation, or are otherwise uncertain, an oral contract is unenforceable. Poulos v. Home Fed. Sav. & Loan Ass'n, 385 S.E.2d 135, 137 (Ga. Ct. App. 1989). A breach occurs "if a contracting party repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible." UWork.com, Inc. v. Paragon Technologies, Inc., 740 S.E.2d 887, 893 (Ga. Ct. App. 2013).

Defendants claim two infirmities in Plaintiffs' alleged contract. Defendants assert, first, that the Complaint acknowledges that the parties to the JVA never agreed to the total amount of compensation for the use of Plaintiffs' life stories, and second, that the JVA did not specify how and in what amounts money, attention, and charitable donations would be directed to an entity to be controlled by the Lost Boys, an entity that did not yet exist. Dkt. No. [9-1] at 14-15.[16]

---

[16] The Court notes that the parties agreed to an immediate payment of $55,000 to the Lost Boys for participating in the Interviews. Defendants claim that the payment was never made, Dkt. No. [23] at 15-16, but that allegation is not found in the Complaint.

Both of Defendants' contentions concern potential uncertainty in the JVA. Taking the latter assertion first, Defendants object to construing a term of a contract to direct all charitable donations, in whatever amount, to an organization that did not yet exist as sufficiently definite to lend itself to enforcement under Georgia law. Yet the identity of the organization is not uncertain; the name of a charity may change several times over the years without running afoul of its entitlements and obligations. A "deferral of agreement on a nonessential term does not invalidate an otherwise valid contract." Goobich v. Waters, 640 S.E.2d 606, 609 (2006) (citation omitted). What the law requires is that the organization be sufficiently "definite," and the agreement that the organization receiving charitable donations to come be founded and controlled by the Lost Boys is well-defined. Similarly, 100% is a "definite amount," even if the absolute number and size of donations to flow from publicity efforts around the planned film were then unknown. See Thompson v. Kohl, 453 F.2d 485, 488 (Ga. Ct. App. 1994) ("10 percent of corporate shares ... is a definite amount."). The Court therefore finds that the fact that the Lost Boys' charity was not yet formed does not preclude enforcement of the contract as a matter of law.

Defendants' other argument relates to the amount of future compensation. At first glance, the term of the JVA allowing the parties to agree on a definite amount of compensation, once a film production was in hand and a third-party studio or filmmaker was brought into the fold resembles an agreement to agree in the future. "An agreement to reach an agreement is a contradiction in terms and

imposes no obligation on the parties." <u>Poulos</u>, 385 S.E.2d at 137 (citation omitted). On closer inspection, however, two features of the JVA cause the Court to read the alleged terms as more concrete.

First, compensation simply could not have been fixed at the time of agreement, as the parties then acknowledged and acknowledge now. Neither the compensation for the Lost Boys' participation in the Interviews and the Screenplay, nor the precise terms of their consent to a finalized Screenplay, could be fully drawn without the involvement of filmmakers. It is fair to conclude from the Complaint that in order to obtain the Lost Boys' consent to produce a film, the Screenplay must have fairly reflected their stories and shown the Lost Boys in a positive light, and that the producers must have allowed for adequate compensation.

Second, the purported "agreement to agree" on compensation, consent, and charitable activities was not a commitment for the parties to the JVA to negotiate *between themselves*, but to negotiate *together with* third-party studios or filmmakers. <u>See</u> Dkt. No. [19] at 20. The term created a definite agreement that, without a future accord with a third-party filmmaker that included the Lost Boys, no film would or could be made. In light of the Court's obligation to construe factual allegations (such as the terms of the oral contract) in favor of the nonmoving plaintiffs, Defendants' arguments fail.[17]

---

[17] Defendants argue that Plaintiffs' own statements at the April 15, 2013 meeting show that an oral contract never existed. Dkt. No. [9-1] at 5, 9, 17; Dkt. No. [9-4]

Defendants have not demonstrated that Plaintiffs' claims based on the existence of an oral contract should be dismissed at this stage of the case. Because there is no dispute over whether Plaintiffs have alleged the remaining elements of a breach of contract claim, that claim survives. Plaintiffs' claims related to the oral contract – breach of the duty of good faith and fair dealing, breach of fiduciary duty, and a demand for an accounting – also survive Defendants' motion.

### 3.  Claims Pleaded in the Alternative to Contract

Defendants also contest claims Plaintiffs press in the alternative to their contract-based causes of action. Plaintiffs raise three "Alternate Count[s]" against Nagle, Newmyer, Silver, and Outlaw, on the one hand, and against the Corporate Defendants on the other: Unjust Enrichment (Counts XI and XII), *Quantum Meruit* (Counts XIII and XIV), and Promissory Estoppel (Counts XV and XVI).

### i.  Unjust Enrichment and *Quantum Meruit*

Defendants argue that Plaintiffs fail to state a claim for either unjust enrichment or *quantum meruit* because (1) the claims are preempted by the Copyright Act, so Counts XI, XII, XIII, and XIV should be dismissed; and (2) the allegations do not support Plaintiffs' assertions that they conferred a benefit on

---

at 8-14. Mindful of the Court's obligation to construe factual allegations in Plaintiffs' favor, this statement is better and more fairly construed as affirming the terms of the JVA, in that the parties *were unable* to come to an agreement as to the precise terms of Plaintiffs' compensation, consent, and charitable donations direction and use without knowing the identity of the filmmakers or the terms of production.

the Corporate Defendants or performed services valuable to the Corporate Defendants, so Counts XI and XIII should be dismissed. Dkt. No. [9-1] at 26-27, 31.

The Court has already found that these claims are not preempted. See Section III.B.1 supra. The Court has also explained that Plaintiffs alleged the Corporate Defendants knowingly succeeded to the obligations of the JVA. See Section III.C.1.iii supra. Even if the JVA were alleged to be unenforceable, the Corporate Defendants – the producers of *The Good Lie*, and thus the ultimate beneficiaries of Plaintiffs' conferred benefits and performed services – were allegedly aware of the benefits and services Plaintiffs conferred and performed through participation in the Interviews when Plaintiffs approached them in April 2013 seeking compensation. Plaintiffs have alleged sufficient facts to support these claims.

Defendants contend that Plaintiffs' Response does not address the Corporate Defendants' arguments concerning the sufficiency of the facts of the Complaint to support the claims against them, and so concede their lack of merit. Dkt. No. [23] at 7-8 (referring to Dkt. No. [9-1] at 31). In their Response, Plaintiffs address Defendants' preemption arguments. Dkt. No. [19] at 28-29. Plaintiffs also address the Corporate Defendants' arguments that they fail to plead specific facts supporting their liability for several claims, including Counts XI and XIII, by citing the Corporate Defendants' acquisition of the obligations of the JVA alongside the benefits of obtaining productions rights in the Screenplay.

Id. at 33-34. This argument also serves to respond to the Corporate Defendants'
additional, conclusory attack on the sufficiency of the facts of the Complaint to
support Counts XI and XIII. See Dkt. No. [9-1] at 31. Accordingly, these claims
survive Defendants' Motion.[18]

### ii.  Promissory Estoppel

Defendants claim Plaintiffs have not pleaded facts supporting their
promissory estoppel claims, as the Complaint lacks both an actual promise made
by any Defendant, whether in 2003 or 2013, and reasonable reliance on that
promise by the Plaintiffs. Dkt. No. [9-1] at 28, Dkt. No. [23] at 18-19. Plaintiffs
emphasize that their allegations control their claim, not Defendants'
interpretations of the 2003 encounter and interpretations and transcript of the
2013 meeting, and argue that they "detrimentally and reasonably relied on
[Defendants'] promises by participating in" the Interviews. Dkt. No. [19] at 31.
Plaintiffs also have pleaded that they relied on the Corporate Defendants'
assertions that they would compensate them in an amount to be negotiated in
good faith for telling their life stories to Nagle and allowing them to be used in
the Screenplay and subsequent film. Dkt. No. [1] ¶¶ 87-94.

---

[18] Plaintiffs submitted a Sur-Reply Memorandum in Opposition to Defendants'
Motion to Dismiss, Dkt. No. [28], which is not permitted by Court's Local Civil
Rules absent leave of the Court. See LR 7.1A, NDGa. The Sur-Reply addresses
Defendants' assertion that Plaintiffs concede the meritless nature of their unjust
enrichment and *quantum meruit* claims pleaded against the Corporate
Defendants. The Court did not need to rely on the Sur-Reply in rejecting that
assertion for the reasons stated.

"A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires." O.C.G.A. § 13-3-44(a). Where a promisee has "suffered detriment in reliance on a gratuitous promise" by a promisor, and "is relying on a promise and not on a misstatement of fact, the appropriate term to describe the doctrine is 'promissory estoppel,' to distinguish it from its ancestor, equitable estoppel." 4 Samuel Williston, Williston on Contracts § 8:4 (4th ed.). Essential elements of an action for promissory estoppel are:

> (1) the defendant made a certain promise or promises; (2) the defendant should have reasonably expected the plaintiff to rely on such promise or promises; (3) plaintiff did, in fact, rely on such promise or promises to his detriment; and (4) an injustice can be avoided only by the enforcement of the promise, because the plaintiff surrendered, forgoes, or rendered a valuable right.

Pabian Outdoor-Aiken, Inc. v. Dockery, 560 S.E.2d 280, 282 (Ga. Ct. App. 2002). "A 'promise' may be defined as a manifestation of an intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Foley Co. v. Warren Eng'g, Inc., 804 F. Supp. 1540, 1544-45 (N.D. Ga. 1992).

As alleged, Newmyer (through Outlaw) and Nagle promised compensation and charitable donations in exchange for using Plaintiffs' personal experiences and life stories in the Screenplay, which would be made into a film that itself would not be produced without Plaintiffs' approval of the script. Plaintiffs

allegedly relied on those promises by providing their personal experiences and life stories in the Interviews. They later suffered when they did not receive full compensation for their commercially valuable stories and were not consulted prior to production of *The Good Lie*, which relied on a revised version of the Screenplay. In the absence of a contract, these facts state a claim for promissory estoppel against the Screenplay Defendants.

Unlike the breach of contract claim against the Corporate Defendants, Plaintiffs' promissory estoppel claim against them cannot rely on promises the Screenplay Defendants made. Assuming *arguendo* that the JVA is not a contract, the Corporate Defendants' acquisition of production rights in the Screenplay would not include the burden of complying with promises made by the Screenplay Defendants prior to the acquisition. Cf. Johnson v. Modine Mfg. Co., 222 F. Supp. 2d 1141, 1146 (S.D. Iowa 2002) (granting summary judgment to defendant on promissory estoppel claim where "assurances by several parties, none of whom had authority to bind Modine to the purchase ... does not amount to a clear and definite promise"); Dunnaville v. McCormick & Co., 21 F. Supp. 2d 527, 535 (D. Md. 1998) ("[I]t is also clear that [defendant's agent] lacked the actual or apparent authority to bind McCormick orally to such a significant transaction.").

Plaintiffs explain, however, that the Corporate Defendants promised them to negotiate in good faith to resolve their dispute by making a donation to the Foundation:

> At the end of the April 15, 2013 meeting, Ms. Smith and Ms.
> Sherwood acknowledged their assumption and adoption of the Joint
> Venture Agreement, agreed to compensate the Contributing Lost
> Boys for their contribution to The Good Lie by making a donation to
> the Contributing Lost Boys' Foundation, and agreed to further
> negotiate in good faith the exact dollar amount for the donation.

Dkt. No. [1] ¶ 88. Showing that the Corporate Defendants reasonably should have

expected reliance on Smith's statements, Plaintiffs reasonably relied on her

representations by attempting to confer and by submitting a proposal for

resolving the dispute to the Corporate Defendants. Id. ¶¶ 90-92. By relying on the

Corporate Defendants' assertion, through Smith, that they would negotiate in

good faith, Plaintiffs suffered injury in not receiving compensation for their

contributions prior to the creation and release of *The Good Lie.* These facts are

sufficient, in the absence of a contract, to allege a claim for promissory estoppel

against the Corporate Defendants.

## D. **Fraud**

Defendants move for dismissal of Plaintiffs' two fraudulent inducement

claims against the Screenplay Defendants (Count XVII) and the Corporate

Defendants (Count XVIII). Defendants contend that the Plaintiffs allege (1) no

false statement and (2) no showing of reasonable reliance on the false statement

with the requisite particularity for either fraud claim.

> To establish a fraud claim under Georgia law, a plaintiff must show:
> (1) a false representation by the defendant; (2) scienter; (3) an intent
> to induce the plaintiff to act or refrain from acting; (4) justifiable
> reliance by the plaintiff; and (5) damage to the plaintiff proximately
> caused by the reliance.

<u>Am. Casual Dining, L.P. v. Moe's Sw. Grill, L.L.C.</u>, 426 F. Supp. 2d 1356, 1364 (N.D. Ga. 2006) (citing <u>Next Century Commc'ns Corp. v. Ellis</u>, 318 F.3d 1023, 1027 (11th Cir. 2003)). "Although actionable fraud cannot be based on statements and promises as to future events, there is an exception to this proposition, which is that fraud may be predicated on a promise made with a present intention not to perform." <u>Kirkland v. Pioneer Mach, Inc.</u>, 534 S.E.2d 435, 436 (Ga. Ct. App. 2000).

To survive a motion to dismiss, a claim of fraud must also satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which requires the plaintiff to "state with particularity the circumstances constituting fraud or mistake," although "[m]alice, intent, knowledge, and other condition of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). To state a fraud claim with particularity, the plaintiff must allege (1) the precise statements, documents, misrepresentations, or omissions made; (2) the time, place, and person responsible for the statement or omission; (3) the content and manner in which these statements misled the plaintiff; and (4) what the defendant gained by the alleged fraud. <u>Brooks v. Blue Cross & Blue Shield of Fla., Inc.</u>, 116 F.3d 1364, 1371 (11th Cir. 1997).

Concerning the claim against the Screenplay Defendants, Plaintiffs allege that Nagle and Newmyer (on behalf of Outlaw) represented their willingness to enter the JVA, composed of specific terms governing the parties' actions, obligations, and benefits. Dkt. No. [1] ¶¶ 43-45, 51, 55. The Lost Boys accordingly

relied on that agreement in performing their obligations under the Agreement. Id. ¶ 49. The Screenplay Defendants gained the material needed for Nagle to write the Screenplay without having to compensate the Lost Boys or the Foundation, and without seeking Plaintiffs' consent to make a film in the future. Id. ¶¶ 59-61, 69, 306-07. These representations, as alleged, are sufficient to state a claim for fraud.

Defendants counter that the Plaintiffs admit that they "did not reach an agreement" in 2003. Dkt. No. [9-1] at 29, Dkt. No. [9-4] at 27, 37. As previously noted, this statement is best construed for purposes of this Motion as referring to the inability of the Lost Boys, Newmyer, Nagle, and Outlaw to agree on a definitive amount of compensation, as no studio or filmmaker was yet involved. Plaintiffs thus state a claim for fraudulent inducement against the Screenplay Defendants based on the 2003 meeting (Count XVII).

To support their fraud claim against the Corporate Defendants, Plaintiffs point to a statement by Smith, the leader of Black Label who spoke on behalf of the Corporate Defendants in the April 2013 meeting, that she "absolutely" agreed and felt that the Lost Boys "should be compensated for [their] stor[ies]." Dkt. No. [1] ¶ 87; see also Dkt. No. [9-4] at 12. Smith followed the April 15, 2013 meeting by calling Plaintiffs' counsel and offering $1,000,000 to satisfy the JVA. Dkt. No. [1] ¶ 90. Plaintiffs declined to respond immediately, relying on Smith's actions and statements in an attempt to negotiate in good faith, but counsel for the Corporate Defendants subsequently retracted Smith's offer and denied Smith's

45

affirmation of Plaintiffs' compensation expectations. Id. ¶¶ 87-94. The Corporate Defendants caused *The Good Lie* to be released into the commercial marketplace in 2014. Id. ¶¶ 96, 100.

Defendants argue that negotiating in good faith cannot constitute reliance, Dkt. No. [9-1] at 29, but Defendants cite to no legal authority in support of their assertion. Whether Defendants' actions in reliance were reasonable should be determined on the facts, not on a motion to dismiss. See Breckenridge Creste Apartments, Ltd. v. Citicorp Mortgage, Inc., 826 F. Supp. 460, 466 (N.D. Ga. 1993) ("As a general rule, the issue of whether a party's reliance is reasonable and justified is a question of fact to be determined by the factfinder.") (citing General Amusements), *aff'd sub nom.* Breckenridge Creste v. Citicorp, 21 F.3d 1126 (11th Cir. 1994)); Bus. Res., Inc. v. Gen. Amusements, Inc., 366 S.E.2d 819, 821 (Ga. Ct. App. 1988) ("Ordinarily the question whether the complaining party could have ascertained the falsity of the representations by proper diligence is for determination by the jury.") (citations omitted).

As alleged, Plaintiffs state facts occurring during and after the April 15, 2013 by Smith, acting with apparent authority to represent the Corporate Defendants, by the Corporate Defendants' counsel, and by Plaintiffs in reliance on these actions, with enough particularity to state a fraud claim against the Corporate Defendants (Count XVIII).

### E. <u>**Commercial Misappropriation**</u>

Plaintiffs allege that all Defendants have commercially appropriated their respective names or likenesses for commercial advantage and without their consent, claiming violations of Georgia common law. Dkt. No. [1] ¶¶ 220-27. Plaintiffs explain that Defendants appropriated their personal experiences and life stories in fleeing war and genocide in their native country and in moving to the United States as refugees – the heart of their respective identities – and so have appropriated their likenesses for commercial gain via *The Good Lie* without Plaintiffs' consent. Dkt. No. [1] ¶¶ 223-25. Defendants respond that none of the Lost Boys' names, images, or likenesses appears in *The Good Lie*, meaning that Plaintiffs cannot state a commercial appropriation claim. Dkt. No. [9-1] at 27, Dkt. No. [23] at 24-25. Plaintiffs contest this assertion that the Lost Boys' likenesses do not appear in *The Good Lie*, claiming Defendants' have appropriated their likenesses "through the use of characters and scenes based almost entirely on stories from the 2003 interviews." Dkt. No. [19] at 30. The Court must determine whether the tort for appropriation of a person's name or likeness encompasses the use of his personal story without reference to his name or image.

Commercial appropriation is one of several torts included within the broader common law tort of the invasion of privacy.

> These four torts may be described briefly as: (1) intrusion upon the plaintiff's seclusion or solitude, or into his private affairs; (2) public disclosure of embarrassing private facts about the plaintiff; (3)

> publicity which places the plaintiff in a false light in the public eye;
> [and] (4) *appropriation, for the defendant's advantage, of the*
> *plaintiff's name or likeness.*

Bullard v. MRA Holding, LLC, 740 S.E.2d 622, 626 (Ga. 2013) (emphasis added)

(quoting Martin Luther King, Jr., Ctr. For Soc. Change, Inc. v. Am. Heritage

Prods., Inc., 296 S.E.2d 697 (Ga. 1982)). A plaintiff stating a commercial

appropriation claim must allege appropriation of another's name or likeness,

without consent, for the financial gain of the appropriator. Bullard, 740 S.E.2d at

626.

Plaintiffs rely in significant part on the Georgia Supreme Court's

explanation, relying on a well-known treatise, in first announcing the existence of

the right of publicity to support their theory of appropriation:

> Unlike intrusion, disclosure, or false light, appropriation does not
> require the invasion of something secret, secluded or private
> pertaining to plaintiff, nor does it involve falsity. It consists of the
> appropriation, for the defendant's benefit, use or advantage, of the
> plaintiff's name or likeness. … "The interest protected [in the
> 'appropriation' cases] is not so much a mental as a proprietary one,
> in the exclusive use of the plaintiff's name and likeness as an aspect
> of his identity."

Cabaniss v. Hipsley, 151 S.E.2d 496, 503 (Ga. 1966) (quoting Prosser, William L.,

Privacy, 48 CALIF. L. REV. 383, 406 (1960)). This assertion that appropriation

seeks to protect "an aspect of … identity" has been carried forward from Cabaniss

to Martin Luther King to Bullard.

In each of these cases, however, the plaintiff stated a claim by alleging

harm due to the improper use of a name or image. In Cabaniss, an exotic dancer

sought damages from a magazine publisher and owner of Atlanta's Playboy Club

48

for using a photograph of her face and body in advertisements inviting readers to patronize the Club. Cabaniss, 151 S.E.2d at 501, 508-09. In Martin Luther King, the court affirmed the reasoning in Cabaniss by holding that Dr. King's heirs could "seek to prevent the exploitation of his likeness in a manner they consider unflattering and unfitting," even though Dr. King did not commercialize his likeness in his lifetime. Martin Luther King, 296 S.E.2d at 706.

In Bullard, the court held that a woman's allegations that a still photo of her face and (censored) exposed breasts taken from video footage was used to endorse a video including that footage and similar recordings of other women exposing their breasts, without her consent and for the video producer's commercial gain, stated a claim for commercial appropriation. Bullard, 740 S.E.2d at 626-27. The court explained that a private citizen, as well as a celebrity, was entitled to protection from commercial exploitation of her name and likeness for another's commercial gain because the interest protected by the commercial appropriation tort is the interest in an aspect of his or her identity. Thus, the Court found no "requirement in Georgia law that the plaintiff must have any inherent or preexisting commercial value in his or her name before a wrongful appropriation takes place in order to maintain a viable claim for appropriation." Id.

The Eleventh Circuit has also considered the scope of the appropriation tort with regard to the publication of a private citizen's nude image without consent for commercial gain in connection with the "newsworthiness" exception

to protections afforded by the right to privacy compelled by the First Amendment. Drawing a similar conclusion to the <u>Bullard</u> court, the Eleventh Circuit in <u>Toffoloni v. LFP Publ'g Grp., LLC</u>, 572 F.3d 1201 (11th Cir. 2009) held that commercial appropriation "does not require invasion of something secret, secluded or private pertaining to plaintiff," but only "appropriation, for the defendant's benefit, use or advantage, of the plaintiff's name or likeness." <u>Id.</u> at 1206 (quoting <u>Cabaniss</u>, 151 S.E.2d at 503-04). Even though the magazine publisher included alongside the nude photos a short article about the woman's murder at the hands of her husband, a former professional wrestler of some renown, the court found that the "newsworthy" article was incidental to the commercial use of the nude photos, and reversed the district court's order dismissing the commercial appropriation claim. <u>Id.</u> at 1209-13.

     <u>White v. Samsung Elecs. Am., Inc.</u>, 971 F.2d 1395, 1398 (9th Cir. 1992), *as amended* (Aug. 19, 1992), which Plaintiffs also cite, also relies on an image used to refer the viewer to the appearance of a famous figure, here, *Wheel of Fortune*'s Vanna White. The Ninth Circuit Court of Appeals held that a plaintiff could sue for commercial appropriation so long as the plaintiff could show "the defendant had in fact appropriated the plaintiff's identity," regardless of the means employed, such as her name, likeness, voice, signature, or photograph. <u>Id.</u> at 1398. In the circumstances shown on summary judgment, where the defendant manufacturer's commercial included a robot dressed in the same manner as White, engaged in the same actions she took while on television, on a set similar

to the *Wheel of Fortune* set, there was a dispute of material fact over whether the defendant's actions "directly implicated the commercial interests which the right of publicity is designed to protect" to appropriate her identity. White, 971 F.2d at 1398-99.

Nowhere in this line of cases, or in any case cited by Plaintiffs, is authority for the notion that reproducing one's narrative, personal story, life experience, or other actual event, in the absence of the use of one's name, image, or other identifying characteristic, is equivalent to one's *likeness*.

Courts in this Circuit have considered, in the context of the newsworthiness exception, whether the primary commercial attraction of a published likeness is a matter of public concern or purely private information. In Toffolini, the court implied that a "likeness" includes personal experiences subject to commercial exploitation, particularly those not "open to public observation" prior to publication. Toffolini, 572 F.3d at 1208 & n.1 ("[T]he right of publicity must attach to that which is not open to public observation and is appropriated for the commercial benefit of another. … The question, then, is whether the information disclosed was public rather than private—whether it was generally known and, if not, whether the disclosure … can be said to have been to the public at large.") (citation omitted).[19]

---

[19] "[W]hile private citizens have the right of privacy, public figures have a similar right of publicity." Martin Luther King, 296 S.E.2d at 703. The two rights are similarly structured, and both allow for vindication via a commercial appropriation action.

In <u>Somerson v. World Wrestling Entertainment, Inc.</u>, 956 F. Supp. 2d 1360 (N.D. Ga. 2013), the plaintiff former professional wrestler brought a claim for violation of his right to publicity, alleging that "defendant is using plaintiff's name *and persona* solely to further its own commercial efforts" through featuring both on its website. <u>Id.</u> at 1364 (emphasis added). Plaintiff claimed that the use of his persona and tales of his exploits in his professional wrestling career were not subject to the "newsworthiness" exception, allowing publication of matters of public concern otherwise protected by the right to privacy, because the defendant had published them for commercial, rather than journalistic, reasons. <u>Id.</u> at 1368-69.

The court disagreed, reviewing the defendant's website and finding that the defendant's use of plaintiff's "identity is not being used to sell a product in an advertisement, but instead, is referred to as part of the historical events of professional wrestling." <u>Id.</u> at 1369. In support, the court cited to the <u>Restatement (Third) of Unfair Competition</u> § 46 (1995), providing that liability may attach for appropriating "the commercial value of a person's identity by using without consent the person's name, likeness, *or other indicia of identity for purposes of trade.*" <u>Id.</u> § 46. Using another's name, likeness, or identity "for purposes of trade," in turn, means using it "in advertising the user's goods or services," in placement "on merchandise marketed by the user," or "in connection with services rendered by the user." <u>Id.</u> § 47. This "does not ordinarily include the use of a person's identity in news reporting, commentary, entertainment, *works of*

*fiction or nonfiction*, or in advertising that is incidental to such uses." Id. (emphasis added).[20]

Based on the Court's review of these cases, Defendants are entitled to dismissal of Plaintiffs' commercial appropriation claim. Plaintiffs have not alleged that any of their names or images were used or referenced in the work, either on the margin or at the heart of the commercial appeal of the film. That these experiences were used in a work of fiction, not on merchandise or in a straightforward commercial appeal, further removes them from an appropriator's archetypical effort to profit from Plaintiffs' specific identities. The Court therefore **GRANTS** Defendants' motion to dismiss Plaintiffs' commercial appropriation claim (Count VIII).

### IV.   CONCLUSION

In accordance with the foregoing, the Court **GRANTS in part and DENIES in part** Defendants' Motion to Dismiss [9]. The Court **GRANTS** Defendants' Motion without prejudice as to Plaintiffs' causes of action for declaratory judgment (Count II) and for commercial appropriation (Count VIII). The Court **DENIES** Defendants' Motion as to all other claims.

---

[20] That the publisher gains some "commercial advantage from an otherwise permitted use of another's identity does not render the appropriation actionable." Somerson, 956 F. Supp. 2d at 1390 (citing Restatement (Third) of Unfair Competition § 47 (1995), Comment c). Even if Defendants profit from the release of *The Good Lie*, that is not enough for Plaintiffs to state an appropriation claim; the use itself must be improper.

**IT IS SO ORDERED** this 22nd  day of March, 2016.


_____
LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE